# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| **LEXINGTON INSURANCE COMPANY,** | ) | |
| **CERTAIN UNDERWRITERS AT** | ) | |
| **LLOYD'S OF LONDON SUBSCRIBING** | ) | |
| **TO POLICY NO. 012944882,** | ) | |
| as Subrogees of Gavilon Grain, LLC | ) | |
| and Gavilon Fertilizer, LLC, | ) | |
| **GAVILON GRAIN, LLC, and** | ) | |
| **GAVILON FERTILIZER, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| vs. | ) | **CASE NO. 14-cv-610-CVE-TLW** |
| | ) | |
| **NEWBERN FABRICATING, INC., and** | ) | |
| **BAUCOM CONCRETE** | ) | |
| **CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **NEWBERN FABRICATING, INC.,** | ) | |
| | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **DOVELAND ENGINEERING CO.,** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **BAUCOM CONCRETE** | ) | |
| **CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **COMMERCIAL METALS COMPANY,** | ) | |
| | ) | |
| **Third-Party Defendant,** | ) | |

## REPORT AND RECOMMENDATION

As set forth in the District Court's July 28, 2016 Opinion and Order (dkt. 285), this action arises from the collapse of an exterior wall to a fertilizer storage facility (the "Facility") at the Tulsa Port of Catoosa on March 7, 2013. Plaintiff Gavilon Grain owned the Facility, which Gavilon Fertilizer used to store fertilizer.[1] In 2004, Gavilon Grain contracted with defendant Newbern Fabricating, Inc. to build the Facility. Third-Party Defendant Doveland Engineering Co., Third-Party Plaintiff Baucom Concrete Construction Co., and Third-Party Defendant Commercial Metals Company were all contractors on the project. The Facility was operational in early 2006.

Newbern has filed a motion seeking to exclude or limit the testimony of Gavilon Fertilizer's structural engineer, Lauran Larson. (Dkt. 132).[2] Doveland (dkt. 139, 248) and Baucom (dkt. 246) join in Newbern's motion. Newbern raises three arguments. First, Newbern argues that Larson does not have the expertise necessary to render opinions regarding the cost to repair the Facility and regarding the alleged failure of the rebar. (Dkt. 132). Second, Newbern argues that Larson's opinion on the cost to repair and/or remediate the Facility is not based upon a sound methodology. Id. Third, Newbern argues that Larson's opinion on cost is not based on sufficient facts or data. Id.

The Court will address Larson's opinions regarding repair costs first, followed by his opinions related to the alleged failure of the rebar.

---

[1] When referencing Gavilon Grain and Gavilon Fertilizer together, the Court uses Gavilon.

[2] The Court will consider Newbern's motion by report and recommendation.

I.

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the Supreme Court held that district courts must act as "gatekeepers" and conduct an initial assessment of the admissibility of "scientific" expert testimony under Federal Rule of Evidence 702.[3] The Supreme Court extended this gatekeeper role to all expert testimony in <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999).

The Tenth Circuit, in <u>Bitler v. A.O. Smith Corp.</u>, 400 F.3d 1227 (10th Cir. 2005), discussed the role of district courts when considering a <u>Daubert</u> challenge to the admissibility of expert testimony. First, the court should make a preliminary finding that the expert is qualified to testify. <u>Id.</u> at 1232–33. Next, the proponent of the testimony must establish that the expert used reliable methods to reach his conclusion and that the expert's opinion is based on a reliable factual basis. <u>Id.</u> at 1233. The Tenth Circuit cited four factors that district courts should apply to make a reliability determination:

> (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

<u>Id.</u> at 1233 (citing <u>Daubert</u>, 509 U.S. at 593–94). The Tenth Circuit was clear that "a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." <u>Id.</u> In other cases, the Tenth Circuit has emphasized that any analytical gap in an expert's methodology can be a sufficient basis to exclude

---

[3] Federal Rule of Evidence 702 permits a qualified expert witness to testify and render an opinion when (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

expert testimony under Daubert. Trucks Ins. Exchange v. MagneTek, Inc., 360 F.3d 1206, 1212–13 (10th Cir.2004); Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 992 (10th Cir.2003). "'[A]ny step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" Mitchell v. Gencorp Inc., 165 F.3d 778, 782 (10th Cir.1999) (quoting In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir.1994)).

## II.

Newbern argues that Larson is not qualified to render an expert opinion regarding the cost of repairing the Facility because he is a structural engineer and not a construction expert. (Dkt. 132). Newbern states that Larson's expertise is limited to the type and scope of repairs necessary to rebuild the Facility and that he does not have the education or experience to opine on the cost to do so. Id. Gavilon argues that Larson "regularly obtains cost estimates for the scope of work he is proposing," and that his experience in this area, combined with his education and experience as a structural engineer, qualify him to testify regarding the cost of repairing the Facility. (Dkt. 192).

There does not appear to be Tenth Circuit authority addressing the specific issue presented here; that is, the vocation or qualifications necessary for a person to testify as an expert regarding repair costs to a damaged building. However, Daubert and Kumho Tire make clear that the issue in such cases is not necessarily the vocation or profession of the proffered expert (as argued by Newbern), but whether the expert has sufficient education and/or experience in the relevant subject matter (as argued by Gavilon).

Larson's CV discusses his education and experience as an engineer in designing new structures and rehabilitating existing facilities. (Dkt. 192-2 at 2). His CV indicates that he is employed by Krech Ojard & Associates and lists his professional experience since 2008 as

"inspection, condition assessment, design, and construction administration for marine facilities including Ocean Ports, River Ports, and Private Industry Barge Terminals." Id. Other than the reference to "construction administration for marine facilities," nothing in Larson's CV, or his expert report, even remotely references experience in reviewing or preparing construction cost estimates. Id. Larson's deposition testimony confirms this lack of experience.

During his deposition, Larson indicated that his current work for Krech involves "structural engineering related to barge facilities, ship ports, thing[s] like that . . . includ[ing] river terminals." (Dkt. 132-2 at 2). Prior to working for Krech, he managed a structural engineering group and was responsible for the "[s]tructural design of a variety of buildings: institutional, educational, industrial." Id. at 4. Larson did not testify that preparing construction cost estimates for structural repair work is, or has been, a part of his professional experience, although he did testify that he has the narrower experience of estimating the "general conditions"[4] line item on construction contracts and that his "prior experience" allowed him to opine regarding the cost to mobilize staff to a remote site and develop an engineering report. Id. at 48-50; (Dkt. 192 at 33). Larson also testified that in one prior case he prepared a "Statement of Probable Cost." (Dkt. 192-1 at 11). He said, "[w]e created plans and details that illustrated the aspects of the repairs. We distributed those to multiple contractors, and through multiple telephone conversations, developed with them the costs associated with each remediation alternative." Id. at 12. Other than this one instance, none of Larson's testimony establishes that he has any education or experience in cost estimation, and even in this instance, his experience appears to be limited to collecting estimates from contractors, ensuring that the contractors understand the nature of the work being estimated and then, based on the contractor's specific feedback, estimating costs.

---

[4] The "general conditions" line item includes on-site expenses such as trailers and utilities. Id.

Moreover, Larson's deposition testimony establishes that Larson has almost no experience estimating the specific costs at issue here and that he was, more often than not, unable to explain the basis of the costs he did estimate, beyond referring to the estimates provided by the contractors, referring to his "experience," or stating that he increased an estimate because he believed it was inaccurate or could not determine that it was accurate. See infra. at III. Rule 702 does not allow Larson to attempt to aid the jury or the Court in understanding the cost of repairing the Facility by serving as a mere a conduit for estimates prepared by contractors who are not going to be called as witnesses and who are not subject to the strictures of Rule 702 and Federal Rule of Civil Procedure 26.

Thus, while an engineer could have such extensive background and experience reviewing construction estimates and interacting with contractors that she or he might be an expert on the issue of repair costs, the experience Larson has is so sparse that it does not approach a level that could be called expertise.

Therefore, the Court finds that Larson is not qualified to testify regarding the cost to repair the Facility or similar structures.

III.

Newbern argues that Larson's Statement of Probable Costs is neither based on a sound methodology nor sufficient facts and data.[5] Specifically, Newbern contends that Larson's "Statement of Probable Costs is a mish-mash of estimates, made up figures, and unrelated amounts." (Dkt. 132). Newbern contends that specific line items within the estimate are not based on data, either because Larson did not obtain an estimate or because he rejected the estimates he

---

[5] The Court will consider this issue even though doing so is unnecessary because of the Court's finding that Larson is not qualified to testify regarding repair costs.

did obtain in favor of an arbitrary number. Id. Gavilon argues that Larson's methodology, as set forth during his deposition testimony, is sound and meets the requirements of Rule 702. (Dkt. 192). In this regard, Larson testified that he "created plans and details that illustrated the aspects of the repairs. We distributed those to multiple contractors, and through multiple telephone conversations, developed with them the costs associated with each remediation alternative." (Dkt. 192-1 at 12).

Gavilon accurately summarizes Larson's stated methodology, and while that methodology might be sound were he to have the requisite level of education or experience to opine on the issue of cost, the Court must consider the methodology he employed, not the one he said he employed. Bitler, 400 F.3d at 1233 (quoting Mitchell, 165 F.3d at 781). The best means of considering Larson's methodology is an analysis of his deposition testimony.

Larson's probable cost statement includes $700,000.00 for the "dividing wall columns" and $300,000.00 for "low wall columns." (Dkt. 132-1 at 14; 132-2 at 32). To get these numbers, Larson reviewed two quotes, one for $1.4 million and another for $790,000.00, then he "roughly split the difference between the two as an estimate." (Dkt. 132-2 at 33). Larson admitted that the two quotes were not "hard bids" and that he had never prepared an estimate to repair a reinforced concrete bulk storage like what was quoted. Id. at 34. The problem here is that Larson's report makes no effort to explain the two quotes, the qualifications of the firms providing the quotes, or the basis for concluding that either quote is a reliable source of information. In addition, even assuming both quotes are reliable, which seems unlikely since one is more than seventy-five percent higher than the other, Gavilon has not presented any evidence that "roughly splitting the

difference" between two quotes is an acceptable technique for estimating costs on this type of repair work.[6] Bitler, 400 F.3d at 1233.

Similarly, Larson's probable cost for the "row dividing wall panels" and the "low wall panels" is $140,000.00, but the estimate from the contractor was between $115,000.00 and $125,000.00. (Dkt. 132-1 at 14; 132-2 at 32-34). Larson explained that he "wanted to provide some buffer in that estimate" because "[a]t the time that this information was provided to me, there was no structural analysis or design done on the part of [the contractor] for them to determine what their complete costs would be." (Dkt. 132-2 at 35-36). In fact, Larson acknowledged that what he gave the contractor was "a very vague description of scope." (Dkt. 132-2 at 37). When asked what the contractor's work would entail, Larson said, "I know they were going to apply epoxy and carbon fiber reinforcing to both sides of all the panels. But the amount of epoxy, the amount of reinforcing, I don't know." Id. Larson's stated methodology assumes a detailed process of "creat[ing] plans and details that illustrated the aspects of the repairs [and] distribut[ing] those to multiple contractors, and through multiple telephone conversations, develop[ing] with them the costs associated with each remediation alternative." (Dkt. 192-1 at 12). Providing contractors with vague descriptions, without plans or structural analysis, which prevent the contractor from knowing its costs is a method which is inconsistent with a methodology that requires "creating plans and details that illustrated the aspects of the repairs."

In addition, Larson increased the estimate for the "low wall column top restraint" from $81,653.00 to $140,000.00, "[b]ecause it looked to me more complex than maybe what [the contractor] assumed." (Dkt. 132-2 at 38). Specifically, Larson said he spoke with the contractor

---

[6] With sufficient experience estimating construction projects, this method might, based on an expert's own testimony, be sufficient. Here however, there is no evidence that Larson has the experience to make these judgments.

about its estimate and "made some judgments as to whether [the contractor] had understood the entire scope." Id. He further explained that another reason he increased the estimate was that he had only one, "If I sent this detail [to a different contractor], . . . they might have given me a totally different number. That's my experience, is that the range can be quite wide." Id. at 39. Larson then admitted that he could not determine whether the bid he received was low or high. Id. Again, these statements indicate that Larson failed to follow his own methodology and that the methodology he did follow lacks reliability because the contractor did not understand the complexity of the work, Larson obtained only one bid, and Larson lacks the experience to determine what an accurate bid would be (instead, he increased the estimate by almost seventy-five percent).

Next, Larson had no meaningful explanation for assigning $250,000.00 of probable cost to rebuilding the west wall, and he did not explain why the $805,485.00 he included for "MCC Replacement" was an accurate probable cost of repair other than to say that Gavilon informed him that the amount reflected the original cost of constructing the MCC room.[7]

Larson gave a "rough guess" that other equipment costs associated with aligning the conveyor belt would be $12,000.00 after "a quick conversation with our mechanical staff to say the end of the building collapsed, the conveyor and its supporting structure has been hanging for quite some time, what would it take to align it, recommission it, make sure it's safe." Id. at 45. He estimated $20,000.00 to remove the temporary repair columns based on his "assumption of mobilizing a crew and disposing of the columns, whether they be salvaged or just disposed of." Id.

---

[7] In its reply, Newbern objects to using expert testimony to introduce the evidence of the actual cost to install the control room equipment. (Dkt. 218). Newbern argues that Gavilon should be required to introduce the invoice itself. Id. The Court agrees that the invoice is not admissible through Larson; however, if Larson were allowed to testify, the invoice is the type of material on which an expert in the field of cost estimating would rely. Under such circumstances, Larson could refer to the invoice and rely on it during his trial testimony.

at 47. Larson did not consider any salvage value in setting the estimate, and he testified that he had no experience with a "specific project like this" with columns as large as the ones in the Facility. Id. Larson also estimated $90,000.00 for on-site expenses (trailer, utilities, etc.) and a 10% contingency to cover unexpected costs. Id. at 48-50. None of these probable costs is supported by anything other than Larson's own estimation.

The only item that is likely within Larson's experience and expertise is a $10,000.00 estimate for an engineering site inspection and assessment.

As these examples demonstrate, Larson did not employ his stated methodology. Further, Larson's inconsistent approach to compiling his probable costs renders the methodology he did use unreliable. Accordingly, even if Larson were qualified to opine regarding the probable cost to repair the Facility, his testimony would not be admissible because he failed to follow a reliable methodology. The sole exception is the $10,000.00 estimate for an engineering site inspection and assessment.

IV.

Newbern contends that Larson's Statement of Probable Costs is not supported by sufficient facts or data, as required by Rule 702(b). The Tenth Circuit has held that Daubert does not govern this issue because, "[b]y its terms, the Daubert opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion" and "generally does not, however, regulate the underlying facts or data that an expert relies on when forming her opinion." United States v. Lauder, 409 F.3d 1254, 1264 (10th Cir. 2005). In assessing the sufficiency of the facts, the trial court should conduct "a quantitative rather than qualitative analysis." Fed. R. Evid. 702 Advisory Committee Note to 2000 Amendments. As another district court has held, "the Court does not examine whether the facts obtained by the witness are

themselves reliable – whether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion." United States v. Crabbe, 556 F.Supp.2d 1217, 1223 (D.Colo. 2008) (emphasis in original). Accordingly, the trial court should limit its inquiry under Rule 702(b) to "whether the witness obtained the amount of data that the methodology itself demands." Id.

Larson did not utilize sufficient facts or data to support his stated methodology of obtaining multiple estimates from contractors and then using his experience to develop, with input from the contractors, the probable cost of repairing the Facility. Rather, Larson obtained no estimates at all for the west wall repairs, for the alignment of the conveyor belt, for the removal of the temporary columns, or for the on-site expenses and in those areas where he did obtain estimates, he generally acknowledged that those estimates were not reliable. See supra at III. For this additional reason, Larson's cost testimony is not admissible, except with respect to the engineering site inspection and assessment.

V.

Newbern argues that Larson is not qualified by education or experience to testify regarding damage accumulation in the rebar, fatigue in the rebar, or weakening or fracturing in the rebar due to repetitive loading cycles. The specific opinion to which Newbern objects is Larson's statement that

> The primary cause for wall collapse at the Catoosa facility was flexural failure of the concrete columns due to failure of the column vertical steel reinforcing bars. Most of the reinforcing bars open to view within the fracture area revealed that the horizontal tie reinforcing bars had been welded to the vertical bars. (Fig 1) The introduction of welds to reinforcing steel bars, unless done with specific methods and materials under well controlled conditions, creates local flaws in the steel which significantly reduces the tension capacity of the individual bar. It is our opinion that the noted welds diminished the reinforcing steel capacity to a degree which resulted in failure of the wall columns under stored product load.

(Dkt. 132-1 at 3; 132-2 at 12). Newbern argues that Larson is not qualified to render this opinion and cites to Larson's deposition testimony that he has no experience in observing "the fracture surface of steel reinforcing bars to see the gradient in surface roughness." Id. at 17. Newbern also cites Larson's limited education in metallurgy, which is comprised of a few classes in undergraduate and graduate school and a single week-long seminar on steel fatigue, which he attended in 1982. Id. at 8, 17-18. Larson directs the Court to Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 968 (10th Cir. 2001). Finally, Newbern submitted an affidavit from its own metallurgy expert to refute Larson's opinion. (Dkt. 132-7).

Gavilon counters that Larson's education is sufficient to qualify him as an expert on issues related to the rebar and that Newbern improperly relies on Ralston in arguing that Larson must have specialized education or experience in metallurgy. Id. Gavilon contends that the expert in Ralston had no education, knowledge, or experience on the topic of her proposed testimony, while in this case, Larson has the benefit of some undergraduate and graduate classes and the 1982 seminar. Id. In addition, Gavilon cites One Beacon Ins. Co. v. Broadcast Development Group, Inc., 147 F. App'x 535 (6th Cir. 2005) for the proposition that a structural engineer is not precluded from opining regarding fatigue and damage to the steel rebar. (Dkt. 192 at 10). Gavilon states that the court, in One Beacon, held that the "opinions of [a] metallurgist and [a] structural engineer on the same topic were both admissible." Id.

In Ralston, the Tenth Circuit addressed the question of whether an orthopedic surgeon's general knowledge, based solely on her medical education, was sufficient to permit her to testify regarding the sufficiency of the warning for a specific medical device. 275 F.3d at 969-70. The surgeon had no other experience in the medical device at issue and had performed no research. See id. The surgeon also had no experience in drafting warnings for medical devices or surgical

techniques. See id. The Tenth Circuit held that the district court's decision, which found that the surgeon's education – even as a board-certified surgeon – did not qualify her to testify as an expert witness on the topics of the medical device or the adequacy of the warning, was not an abuse of discretion. See id. at 970.

One Beacon involved the collapse of a tower mid-construction when guy wires unexpectedly slipped. One of the issues at the trial was the strength of the tower welds. Id. The trial court allowed testimony from a metallurgist that "it would have been impossible to make welds of the required strength given the type of welds the design drawings instructed the welders to make." Id. at 544. The trial court also allowed testimony from a structural engineer that the failure of welds on the tower must have been the cause of the collapse. Id. at 546. However, the structural engineer rendered no opinion regarding the cause of the weld failure or even the welds themselves. Id. Rather, he testified to the force exerted on the tower when the guy wires slipped, to the strength of bolts connecting various parts of the tower (a fact that was not disputed), and to the impact of having welds that were weaker than designed. Id. Specifically, the structural engineer testified only that if the welds were a "certain strength," then they would have collapsed when the guy wires slipped. Id. The structural engineer did not testify that the welds had any specific strength, that they were weaker than designed, or that they were defective. Id. Thus, the structural engineer and the metallurgist only rendered opinions "on the same topic" in the loosest sense of that phrase. The metallurgist opined regarding weaknesses in the welds, and the structural engineer opined regarding the forces exerted on the tower and the result of those forces if one assumed that the welds had a "certain" strength. Thus, the subject matter of the structural engineer's testimony fell squarely within the field of structural engineering and not at all within the field of metallurgy. For these reasons, One Beacon is not helpful to Gavilon.

Moreover, the Court finds the Tenth Circuit's reasoning in <u>Ralston</u> helpful to Newbern. The gist of Larson's testimony is that the rebar was not properly installed and that the forces acting on the rebar (repetitive loading cycles) resulted in fatigue, and ultimately in a weakness that caused the wall collapse. Testimony regarding the installation is well within Larson's expertise in designing structures ("the horizontal tie reinforcing bars had been welded to the vertical bars"). But testimony regarding the response of the rebar to improper installation and to stresses and strains imposed on the rebar requires specialized skill and training in metallurgy; someone who understands rebar and how it reacts, under the conditions present here, to repetitive loading cycles. To be clear, Larson is not seeking to testify that if the rebar had a "certain" strength, then the rebar would have given way and caused the collapse, as did the structural engineer in <u>One Beacon</u>.[8] Larson is actually opining that the rebar weakened due to repetitive loading cycles, which resulted from improper installation.

Therefore, the Court concludes that Larson lacks the training, knowledge, or experience to testify regarding the reaction of the rebar installed in the Facility to specific forces. Larson admits that, aside from the single week-long seminar in 1982 and a few undergraduate and graduate classes, he has no specialized education in metallurgy. (Dkt. 132-2 at 8). Larson also admits that he has no specific experience in metallurgy. <u>Id.</u> at 12-19. It is Gavilon's burden to establish Larson's expertise, and there is nothing in the record that would allow the Court to conclude that he has expertise in evaluating the manner in which rebar reacts to various stresses and strains, or to improper installation. Thus, Larson is not qualified to testify regarding damage accumulation in

---

[8] In which case Gavilon would need a qualified expert to opine that the rebar was weakened by improper installation or another cause.

the rebar, fatigue in the rebar, or weakening or fracturing in the rebar due to repetitive loading cycles.

The Court also finds that, even if Larson's education were sufficient to qualify him as an expert in this area, Gavilon has failed to meet its burden of establishing that Larson's methodology is reliable. Larson did not conduct any tests on the rebar, and his report does not list the metallurgical test results in the actions and sources used to render his opinion regarding the cause of the wall collapse. (Dkt. 132-1 at 3). Rather, Larson bases his opinion on his observation of the rebar after the wall collapsed. Yet, his deposition testimony and expert report do not contain any evidence that observation is a proper method for evaluating damage accumulation or fatigue, or weakening or fracturing of rebar due to repetitive load cycles.

## VI.

Newbern's motion raises an objection to Larson's reliance on the 2000 International Building Code. That issue has been resolved. (Dkt. 277, 278).

## VII.

Newbern objects to Larson's testimony regarding defects in welding leading to the wall collapse because a 2015 site inspection revealed no welded rebar in any of the other columns examined during that inspection. (Dkt. 132). Newbern argues further that Larson's testimony on this issue should be excluded because Gavilon subsequently demolished the building without providing notice to the parties or to the Court. Id. Newbern has raised this issue in a Motion for Sanctions (dkt. 125) and incorporates those arguments into the instant motion.

As to the first issue, and as set forth above, Larson is clearly qualified, based on his experience as a structural engineer, to testify that the Facility was not built according to design; more specifically here, that the rebar was not installed according to design (including the welds).

He is not qualified to testify regarding the effect on the rebar of a failure to install it according to design. See supra at V. The Court will resolve any remaining issues raised in the Motion for Sanctions in a separate order and finds that those issues need not be decided in order to resolve this motion.

## RECOMMENDATION

Based on the foregoing, the undersigned RECOMMENDS that Newbern's Motion to Exclude or Limit Testimony of Lauran Larson (dkt. 132) be **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

## OBJECTION

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by January 20, 2017.

If specific written objections are timely filed, Federal Rule of Civil Procedure 72(b)(3) directs the district judge to

> determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Id.; see also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 6th day of January, 2017.

_____

T. Lane Wilson
United States Magistrate Judge