### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

LEXINGTON INSURANCE COMPANY;           )
GAVILON FERTILIZER, LLC; CERTAIN       )
UNDERWRITERS AT LLOYD'S OF             )
LONDON; and GAVILON GRAIN, LLC,        )
                                       )
        Plaintiffs,                 )
                                       )
v.                                     )     Case No. 14-CV-0610-CVE-TLW
                                       )
NEWBERN FABRICATING, INC., and         )
BAUCOM CONCRETE CONSTRUCTION,          )
INC.,                                  )
                                       )
        Defendants,                 )
                                       )
and                                    )
                                       )
NEWBERN FABRICATING, INC.,             )
                                       )
        Third-Party Plaintiff,      )
                                       )
v.                                     )
                                       )
DOVELAND ENGINEERING CO.,              )
                                       )
        Third-Party Defendant,      )
                                       )
and                                    )
                                       )
BAUCOM CONCRETE CONSTRUCTION,          )
INC.,                                  )
                                       )
        Third-Party Plaintiff,      )
                                       )
v.                                     )
                                       )
COMMERCIAL METALS COMPANY,             )
                                       )
        Third-Party Defendant.      )

### OPINION AND ORDER

Now before the Court is Third-Party Defendant Commercial Metals Company's Motion for Summary Judgment and Brief in Support (Dkt # 183). Third-party defendant Commercial Metals Company (CMC) argues that third-party plaintiff Baucom Concrete Construction, Inc. (Baucom) has no cognizable claim for indemnity or contribution against CMC, and that Baucom has failed to produce evidence to establish a manufacturer's products liability claim. Dkt. # 183, at 7-9. Baucom responds that it has valid claims for indemnity and contribution, and that it has produced sufficient evidence to support its manufacturer's products liability claim. Dkt. # 257.

## I.

This action arises from the collapse of a wall of a storage facility at the Tulsa Port of Catoosa on March 7, 2013. Plaintiff Gavilon Grain owned the building, which Gavilon Fertilizer used to store fertilizer.[1] Dkt. # 183, at 6; Dkt. # 257, at 5. In 2004, Gavilon Grain contracted with defendant Newbern Fabricating, Inc. (Newbern), a construction company that builds river terminals and equipment, to build a concrete storage building. Dkt. # 257, at 5. Baucom worked as the subcontractor responsible for the concrete work on the project. Dkt. # 183, at 10; Dkt. # 257, at 6. Baucom purchased reinforcing steel bars (rebar) for the project from non-party Diamondback Steel, Inc. (Diamondback). Dkt. # 183, at 10; Dkt. # 257, at 6. At the time, Diamondback obtained all rebar sizes #9 and #10 from CMC. Dkt. # 257-1, at 2. Certified mill test reports for the rebar sold by CMC to Diamondback from September 2004 to February 2005 show that the rebar met the ASTM A 615

---

[1]     In 2011, Gavilon Grain merged with DeBruce Grain, the party that contracted for and oversaw the construction of the storage facility. For clarity's sake, the Court refers to both entities as Gavilon Grain. Also in 2011, Gavilon Fertilizer merged with DeBruce Fertilizer. The Court refers to Gavlion Fertilizer as representative of both entities. See Dkt. # 285, at 3 n.2. When referencing Gavilon Grain and Gavilon Fertilizer together, the Court uses the Gavilon plaintiffs.

standard. Dkt. # 268-2, at 12; Dkt. # 268-3. ASTM A 615 is the accepted industry standard for unaltered rebar. Dkt. # 183, at 11; Dkt. # 183-4, at 10. One piece of rebar recovered from the collapsed wall bore CMC's identifying mark. Dkt. #183, at 10; Dkt. # 257, at 7.

On March 7, 2013, a reinforced concrete wall of the building collapsed. Dkt. # 183, at 6; Dkt. # 257, at 5. Plaintiffs Lexington Insurance Company and Lloyd's of London (insurer plaintiffs) paid a number of claims related to the losses sustained from the wall collapse. Dkt. # 54, 4-5. The Gavilon plaintiffs both suffered losses from the wall collapse, including damage to the building and associated equipment and loss of profit and use of facilities. Plaintiffs thereafter filed this action against defendants Newbern and Baucom, asserting that the damages were caused by inadequate design and installation of the concrete columns. Id. at 5-9. Baucom filed a third-party complaint against CMC, asserting that "[t]o the extent the wall collapse is the result of faulty or inadequate materials, CMC is liable for any such defect . . . [,] and it should be required to appear and defend any claims regarding the wall collapse and contribute and indemnify Baucom against judgment or in settlement." Dkt. # 50, at 2. CMC now moves for summary judgment.

## II.

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

3

trial. <u>Celotex</u>, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" <u>Id.</u> at 327 (quoting Fed. R. Civ. P. 1).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law." <u>Id.</u> at 251-52. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

CMC argues that Baucom has no cognizable claim for indemnity or contribution against CMC, and that Baucom has failed to produce evidence to establish a manufacturing defect claim. Dkt. # 183, at 7-9. Baucom responds that it has valid claims for indemnity and contribution, and that it has produced sufficient evidence to support its manufacturing defect claim. Dkt. # 257.

The Court first considers whether CMC is entitled to summary judgment on the merits of Baucom's products liability claim. In <u>Kirkland v. General Motors Corp.</u>, 521 P.2d 1353 (1974), the

Oklahoma Supreme Court determined that Oklahoma would recognize a claim for manufacturer's products liability. A claim of manufacturer's products liability has three elements:

> 1) the product was the cause of the injury;
>
> 2) the defect existed in the product at the time the product left the manufacturer's possession and control;
>
> 3) the defect made the product unreasonably dangerous to the plaintiff or the plaintiff's property.

Clark v. Mazda Motor Corp., 68 P.3d 207, 208 (Okla. 2003). CMC asserts that Baucom has failed to demonstrate (1) that all the rebar used on the project was made by CMC, (2) that the rebar was defective when it left CMC's control, and (3) that defective rebar caused the wall collapse. Dkt. # 183, at 22-30.

Baucom has failed to provide evidence that the rebar was defective at the time it left CMC's possession and control. Baucom argues that jury could infer that CMC provided defective rebar based on the opinions of Newbern's expert, Edward Cox,[2] Ph.D., P.E., CWI. Dkt. # 257, at 10-11. Dr. Cox opined in his report and testified at his deposition that the rebar in the collapsed wall fractured in a brittle manner. Dkt. # 183-4, at 5; Dkt. # 183-8, at 9. However, Dr. Cox does not opine

---

[2] CMC has filed a motion (Dkt. # 144) to exclude the testimony of Dr. Cox, mistakenly referring to Dr. Cox as "defendants' proposed metallurgical expert," rather than as Newbern's expert. There is no evidence before this Court that Baucom adopted Dr. Cox as its expert, nor did Baucom respond to the motion in limine (Dkt. # 144). However, the magistrate judge inadvertently referred to the respondent as Baucom rather than Newbern in his report and recommendation (Dkt. # 316). In any event, the report and recommendation recommends that CMC's motion in limine (Dkt. # 144) be granted in part and denied in part. Because CMC is the only party that moved to exclude Dr. Cox's testimony, if the Court grants CMC's motion for summary judgment, CMC's motion to exclude Dr. Cox's testimony and the report and recommendation are moot. However, at trial the Court must exercise its duty under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), as gatekeeper, and the report and recommendation (Dkt. # 316), although moot, is instructive in that regard.

in his report or deposition that the rebar was brittle when it was manufactured, and his opinions often contradict Baucom's assertion that CMC provided defective rebar.

First, Dr. Cox opined that as supplied rebar is fundamentally different after use. At his deposition, Dr. Cox testified about the substantial changes rebar undergoes after it leaves the manufacturer's mill. When testifying about why he believes ASTM A 615 is not the proper standard for evaluating rebar recovered from the collapsed wall, Dr. Cox explained that "[a]nytime you bend or twist or manipulate the [re]bar or weld it, you've changed the properties." Dkt. # 183-4, at 13; see also id. at 10 ("Once the end user gets [the rebar] and bends it, twists it, welds it, or changes it, it's no longer A 615 rebar."). He went on to say that "the rebar could have been deteriorated from corrosion. It could have been deteriorated from bending or twisting. So whether or not you can accurately assess the material after use according to its as-supplied standard is questionable." Id. Thus, Baucom's attempt to apply Dr. Cox's brittleness opinion to the as supplied rebar is at odds with Dr. Cox's own testimony.

Second, Dr. Cox does not opine that unmanipulated rebar contributed to the collapse. Dr. Cox agreed that "[a]ll of the rebar that has been identified in this case broke at or near the weld." Id. at 17; see also id. ("Q: Other than the breaks of the rebar at the welds, there was no rebar that was broken anywhere else, like in the middle of the rebar, other than at weld positions; is that true? A: Yes."). Dr. Cox also testified that welding can cause brittleness, and that in this case the welds caused some parts of the rebar to become brittle. Id. at 9, 14-15. Regarding contributing causes to the collapse, Dr. Cox testified as follows:

> Q: How do you believe the rebar that was utilized in the columns contributed to the wall collapse, if any?

6

A: The limited ductility resulted in brittle fractures, combined with metallurgical features, that under the loading conditions present on the day of the collapse resulted in an abrupt catastrophic failure rather than containing whatever was causing the load.

Q: . . . [D]o you believe that the rebar that was not welded contributed in any fashion to the wall collapse?

A: In this particular collapse, no.

Id. at 18-19. There is a distinction between welded and unwelded rebar in this case, and Dr. Cox's opinions regarding brittle fractures in welded rebar do not support Baucom's assertion that the rebar was brittle before welding.

Third, Dr. Cox does not opine that the rebar failed to meet the ASTM A 615 standard. Dr. Cox disputes the proper standard for testing rebar after it has been manipulated, but he does not dispute that ASTM A 615 is the proper standard for rebar at the time of manufacturing. See id. at 10 ("ASTM A 615 applies to the rebar and only the rebar . . . when it leaves [the] steel mill and when it goes into distribution."). Regarding the rebar's compliance with the ASTM A 615 standard, Dr. Cox testified that the rebar "met the tensile requirements, and it met the chemical requirements. But we don't have any data yet to show that it met the bending requirements. . . . That's an unknown." Id. at 18. Dr. Cox testified that the mill test reports would help determine whether the rebar met the ASTM A 615 bending requirement "because any brittleness should have been detected at the mill." Id. at 16; see also id. at 15 ("[T]he intent of [the ASTM A 615 bending requirement] is to find brittle material before it leaves the [mill]. That's why it'd be interesting to see the mill certs on this."); id. at 7 ("A: [A]ll the mill tests should have data for [the ASTM A 615] bend tests. . . . So there should be detailed information that gives the chemistries, the heat numbers, and the extent

7

to which each test sample surpassed the requirements of the bend test. Q: Have you seen any mill tests in this matter? A: Those haven't been produced yet.").

Since Dr. Cox's deposition, the certified mill test reports for all #9 and #10 rebar received by Diamondback from CMC during the time period of September 2004 through February 2005 have been produced. See Dkt. # 268-3. It is undisputed that the mill test reports show that the rebar purchased by Diamondback from CMC met all ASTM A 615 requirements when it left CMC's possession and control. Dkt. # 268-2, at 12 (Affidavit of Robert Jay Block, Ph.D, P.E.); Dkt. # 268-3 (Affidavit of Scott Morrison). Nothing in Dr. Cox's report or testimony shows that the rebar was brittle as provided by CMC or disputes the mill test reports. Nor has Baucom presented any other evidence to show that the rebar was defective when it left CMC's possession and control.

It is undisputed that ASTM A 615 is the proper test for unused rebar, and it is undisputed that the rebar sold to Diamondback by CMC during the relevant time period passed the ASTM A 615 standard. Therefore, there is no genuine dispute regarding whether the rebar was defective when it left CMC's possession and control, and, consequently, Baucom cannot sustain a claim of manufacturer's products liability.[3]

**IT IS THEREFORE ORDERED** that Third-Party Defendant Commercial Metals Company's Motion for Summary Judgment and Brief in Support (Dkt # 183) is **granted**. Commercial Metals Company is hereby terminated as a third-party defendant.

---

[3]     Because Baucom has failed to present sufficient evidence to support a claim of manufacturer's products liability, the Court does not need to reach CMC's contribution and indemnity arguments.

**IT IS FURTHER ORDERED** that Commercial Metals Company's motion in limine (Dkt. # 135), motion to partially exclude testimony of David Teasdale (Dkt. # 137), and motion to exclude the testimony of Edward Cox (Dkt. # 144) are **moot**.

**IT IS FURTHER ORDERED** that the report and recommendation on the motion to exclude the testimony of Edward Cox (Dkt. # 316) is **moot**.

**DATED** this 26th day of January, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

9